UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

LUCIA DOMINICI,                                    :
                Plaintiff,            :
                               :
           v.                              :          No. 5:18-cv-04181
                               :
READING HOSPITAL/TOWER HEALTH,                      :
                Defendant.           :

_____

**O P I N I O N**
**Defendant's Motion for Summary Judgment, ECF No. 35 – Granted**

**Joseph F. Leeson, Jr.**                                                **June 3, 2020**
**United States District Judge**


## I.        INTRODUCTION

Plaintiff Lucia Dominici, a European-Italian woman born in 1960, claims her former

employer, Defendant Reading Hospital / Tower Health, harassed, discriminated, and retaliated

against her based on her race, national original, and age.  The Hospital has filed a Motion for

Summary Judgment asserting its entitlement to judgment on all claims.  For the reasons set forth

below, the Motion is granted.

## II.       PROCEDURAL BACKGROUND

Dominici initiated this action pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 1981, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634,

and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951 – 963.  The Complaint

was dismissed, however, because nothing in Dominici's allegations "plausibly suggest[ed] that

her treatment was based on her nationality, race, age, or gender" or that she was retaliated

against for "oppos[ing] conduct made unlawful by the statutes prohibiting employment discrimination." *See* Opn. 6, ECF No. 5.  Dominici was given leave to amend.

Dominici thereafter filed an Amended Complaint reasserting her federal claims, but not her claim under the PHRA.[1]  *See* Am. Compl., ECF No. 8.  Generally, Dominici, a Psych Tech, alleges that the conduct of her supervisor, Nurse Manager Noel Lojeski, in assigning her to rotate shifts, with additional duties, and in not offering her counseling or verbal reprimands before issuing written warnings was "discriminatory" and "retaliatory."  Dominici contends she endured harassment by Lojeski and by two coworkers, Tracy Koch and Thomasine Peterson, resulting in a hostile work environment.  Dominici alleges that the Hospital was aware of the harassment and discrimination, which was based on her national origin, race, and/or age, but did nothing to stop or prevent it.  Dominici claims that her termination was also an act of discrimination and retaliation.

The Hospital has filed a Motion for Summary Judgment on all claims.  *See* SJ Mot. & Brief, ECF No. 35.  The Hospital argues, first, that it is entitled to summary judgment on the § 1981 claim because Dominici is not a member of a racial minority.  *See id.*  Next, the Hospital asserts that it is entitled to summary judgment on the disparate treatment claims because Dominici cannot establish a prima face case of discrimination.  *See id.*  It asserts that summary judgment should be granted in the Hospital's favor on the hostile work environment claims because there is no evidence Dominici received any work assignment based on her age, race, or

---

[1]     Even if Dominici intended to renew her PHRA claim, "interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA;" therefore, the Court's analysis would be identical.  *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015). *See also Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001) ("The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably.").

national origin or that the comments of Dominici's coworkers rise to the level of a hostile work environment.  *See id.*  Finally, the Hospital contends that because Dominici cannot make a prima facie case of retaliation, it is entitled to summary judgment on the retaliation claims.  *See id.*  Additionally, the Hospital asserts that even if Dominici could establish a prima facie case on any of her claims, it has provided legitimate, non-discriminatory, non-retaliatory reasons for its actions, for which Dominici cannot establish pretext.  In support of its Motion, the Hospital has filed a Statement of Undisputed Material Facts.  *See* Def.'s Stmt. Facts, ECF No. 35-3.  Dominici has filed a brief in opposition to the Motion for Summary Judgment, but has not filed a counter statement of material facts in response to the Hospital's statement.  *See* SJ Resp. ECF No. 38.  Both parties have also filed reply briefs.  *See* SJ Reply, ECF No. 39; SJ Sur-reply, ECF No. 41.

## III.    FACTUAL BACKGROUND

### A.    Federal Rule of Civil Procedure 56(e)(2)

Rule 56(e)(2) of the Federal Rules of Civil Procedure provides: "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."

In the Hospital's Statement of Undisputed Material Facts, filed in support of its Motion for Summary Judgment, each fact is properly supported by a citation to the record and the cited record is attached as an exhibit.  *See* Def.'s Stmt. Facts; SJ Exs., ECF Nos. 35-4 through 35-11.  Dominici, however, has not filed a statement of material facts in opposition to the Motion for Summary Judgment, as required by this Court's scheduling Order dated May 7, 2019, and by its Policies and Procedures, both of which outline the required content for briefs and responses to dispositive motions.  *See* Policies and Procedures Section II(F); Order 2-3, ECF No. 21.  Each

warns the parties that "[a]ll facts set forth in the moving party's statement of undisputed facts shall be deemed admitted unless controverted." *See id.* Dominici was again reminded of these requirements in an Order dated October 18, 2019. *See* ECF No. 37. Thus, consistent with Rule 56(e)(2) of the Federal Rules of Civil Procedure, the Hospital's Statement of Undisputed Material Facts may be deemed undisputed. *See* Fed. R. Civ. P. 56(e)(2); *Robinson v. N.J. Mercer County Vicinage - Family Div.*, 562 F. App'x 145, 147, 149 (3d Cir. 2014) (holding that the district court did not err in concluding that the defendants' material facts were undisputed where the plaintiff failed to oppose the defendants' statement of material facts); *Schuenemann v. United States*, No. 05-2565, 2006 U.S. App. LEXIS 4350, at *15 n.7 (3d Cir. 2006) (holding that the district court properly deemed the defendants' statement of facts as undisputed for purposes of deciding the motion for summary judgment where the plaintiff failed to respond to each numbered paragraph of the defendants' statement of facts). However, in light of Dominici's pro se status, the Court will not deem any fact undisputed to the extent such fact is contested in Dominici's responses to the summary judgment motion and has any support in the record, including Dominici's deposition testimony. To the extent any of the facts discussed below are disputed, they are so noted and distinguished accordingly.

**B.    Undisputed Material Facts**

Dominici commenced employment with the Hospital on or about April 3, 2017, as a Psych Tech. *See* Offer Letter, ECF No. 35-6; Pl.'s Dep. 48:2-6, ECF No. 35-5. Dominici, like all of the Hospital's Psych Techs, worked in the Hospital's Spruce Pavilion, which houses the adult psychiatric department (the "Department"). *See* Pl.'s Dep. 49:11-12. The Department has two floors in the Spruce Pavilion, known as "PG" or "P ground" and "P1." *See id.* 52:24 - 53:13. PG is where geriatric psychiatric patients are housed, and P1 is the location of non-geriatric adult

psychiatric patients.  *See id.* 52:24 - 53:13.  Dominici was hired to work on "Spruce P1."  *See* Offer Letter; Pl.'s Dep. 49:5-19.  Dominici's Offer Letter provides that she would be an at-will employee and that her "employment is not intended to be for any specific duration."  *See id.*

As a Psych Tech, Dominici's job duties included assisting with the provision of patient care to psychiatric patients.  *See id.* 49:5-19.  The written job responsibilities state that Psych Techs shall assist patients with "Bathing, Toileting, Feeding and other activities as needed."  *See* Ex. 4, ECF No. 35-8.  Dominici testified, however, that aside from occasionally assisting with showering or in emergency situations, a Psych Tech on the adult floor does not perform these duties.  *See* Pl.'s Dep. 49:13-23, 62:2-15.  According to Dominici, these are the job duties of a Patient Care Assistant ("PCA").  *See id.* 113:6-7.  Dominici acknowledges, however, that all Psych Techs on PG perform such duties.  *See id.* 114:16-21.  The written job description for the Psych Tech position further states that it does not provide an exhaustive list of all position duties and that nothing "restricts management's right to assign or reassign duties and responsibilities to this job at any time."  *See* Ex. 4 at 2.

Dominici was hired to work two different shifts: days shift (hours 07:00-15:30) and night shift (hours 15:00-23:30).  *See* Offer Letter; Pl.'s Dep. 50:12 – 51:15.  Her schedule rotated such that she would work two weeks on the day shift and then the next two weeks on the night shift. *See id.* 51:2-15, 54:7-13.  Initially, Dominici worked both shifts on P1, but that changed immediately after Nurse Manager Noel Lojeski took over managerial duties, on or about May 29, 2017.  *See id.* 54:14-19; Lojeski Dec. ¶¶ 1-2.  Lojeski declared that under his management, "all Psych Techs were expected to perform the job duties of the PCA position, which duties also were associated with the Psych Tech position, and to work in a PCA role as assigned when staffing needs so required" and "all Psych Techs, including Ms. Dominici, worked in a PCA role

at times and performed direct patient care duties both as a PCA and as Psych Tech consistent with patient care needs."  *See* Lojeski Dec. ¶ 6, ECF No. 35-7.  Lojeski informed employees, during a staff meeting, that all employees, including Psych Techs, would need to rotate between PG and P1.  *See* Pl.'s Dep. 58:22 - 60:15.[2]  Thereafter, Dominici worked day shifts on PG and night shifts on P1.  *See* Pl.'s Dep. 53:21 – 54:1.

At some time after the staff meeting, Lojeski told Dominici that seniority played a role in which floors Psych Techs worked.  *See* Pl.'s Dep. 58:5-10; Lojeski Dec. ¶ 11.  Although Dominici disputes that floor assignment was based on seniority, her disagreement is based solely on Lojeski's statement during the staff meeting that all employees would need to rotate, which is undisputed.  *See* Pl.'s Dep. 59:20 - 60:12; SJ Resp. 2.  Also not in dispute is the fact that all of the other Psych Techs with whom Dominici worked were more senior.  *See* Lojeski Dec. ¶ 11; Pl.'s Dep. 58:5-20.

Sometime before the summer of 2018, Dominici asked Lojeski if she could work on only P1, to which Lojeski stated that she could if she worked all night shifts.  *See* Pl.'s Dep. 51:19 - 52:23.  Dominici's schedule was thereafter changed to all night shifts on P1.  *See id.* 52:11-2.

### i.    Dominici's Written Warnings

The Hospital maintains a policy setting "Guidelines For Corrective Action" to be used by managers to address an employee's behavior and performance.  *See* Rex Ex. F, ECF No. 35-9. The policy states that "performance issues will be addressed through progressive style counseling and written discipline process."  *See id.* 7.  In ascending order of severity, "managers may use . . . based on their evaluation of the situation:" counseling, written warning, and final

---

[2]    In his declaration, Lojeski attested that "the Hospital has had the prerogative to assign Psych Techs (and other employees) to either floor in the Spruce Pavilion, as well as to specific locations on those floors, consistent with the staffing needs of the Hospital."  Lojeski Dec. ¶ 9.

written warning.  *See id.* 7-8.  The policy explains that these tools are only a guide, as some behavior/performance deficiencies may warrant "additional corrective action tools as substitute for, or in conjunction with" these tools.  *See id.* 8.  Additionally, "[t]here may be performance, conduct or safety incidents so problematic and harmful that the most effective action may be the immediate removal of the employee from the workplace."  *See id.*

### a.    First Written Warning

On or about February 7, 2018, the Hospital issued Dominici a First Written Warning.  *See* Pl.'s Dep. 121:6-24; Lojeski Dec. ¶ 12.  The First Written Warning provides, in relevant part:

> Employee deviated from organizational and departmental policies on three separate occasions within two week[s]. 1) Employee allowed a patient to have [a] visitor that was not on the patient's visitor list. 2) Employee did not park in assign[ed] parking after receiving a written warning from security. 3) Employee left her unit keys unattended on the counter in PG.
> The following improvement is expected to occur (Future):
> 1) Employee will park in assigned parking area
> 2) Employee will only allow approved visitors on the unit
> 3) Employee will keep her unit keys secure at all times
> Any future infractions could result in future progressive discipline up to and including termination.

First Warning, Ex. 6, ECF No. 35-8.  Lojeski presented Dominici with the First Written Warning on or about February 7, 2018, and she signed the First Written Warning on that date.  *See* Pl.'s Dep. at 121:21 - 122:5; Lojeski Dec. ¶ 12.

Dominici denies leaving her keys "unattended," but acknowledges that when a coworker returned Dominici's borrowed keys to her, the coworker placed the keys on the counter while Dominici was washing her hands.  *See* Pl.'s Dep. 124:19 – 126:3; Pl.'s Grievance dated April 2, 2018, Ex. 9, ECF No. 35-8 and Ex. 14, ECF No. 35-10.[3]  Dominici admits to the other alleged

---

[3]    In the April 2 Grievance, Dominici wrote to Lojeski:
Noel; you accused me of leaving my keys on the nurse station counter. That was not the case. Doctors, pool staff and many other employees do not have access to

violations for admitting a patient's unlisted visitor and repeatedly[4] failing to park in the assigned area. *See* Pl.'s Dep. 124:1 - 129:7.  She alleges other employees allowed unlisted visitor's in and contends that other employees parked illegally, but cannot name any employee that violated the visitor policy or whom Lojeski permitted to receive two different parking notifications without being disciplined. *See id.* 126:4 – 128:12, 134:1 - 136:13.  Dominici is also not aware of any other employee, whether known or unknown to Lojeski, who allegedly left keys on the counter. *See id.* 119:22 - 120:3.

Lojeski attests that Dominici's failure to maintain control of her unit keys presented a risk to patient safety and welfare, as any Hospital psychiatric patient could have grabbed the keys and utilized them to access an area that was not secure for psychiatric patients. *See* Lojeski Dec. ¶ 14.  Similarly, allowing an unauthorized person to visit a psychiatric patient posed a risk to patient safety and welfare. *See id.* ¶ 15.  Lojeski declares he has "never permitted any employee to allow a patient visitor who was not on that patient's approved visitor list." *See id.* ¶ 16.

### b.   Final Written Warning

The following month, on or about March 16, 2018, Lojeski was provided with a copy of an email from Registered Nurse Brooke Mickshaw, which states that Dominici had been observed on March 6, 2018, punching in for work at the time clock and then leaving the facility to park her car. *See* Lojeski Dec. ¶ 17.  Four days later, Registered Nurse Jamie Wolfe sent an

---

places like bathrooms, kitchen and other facilities. A staff asked me for the keys to use the bathroom and after she returned, she left the keys on the counter right when I was in the middle of washing my hands. You saw the keys there and took them quickly. You knew what happened, but took the opportunity to write me up, instead of following protocol. I apologized and explained it will never happen again and that I will never, give my keys to anyone.
Grievance 2.

[4]      Dominici committed the parking violations on July 10, 2017, and on January 23, 2018, and Lojeski was notified of the same shortly thereafter. *See* Lojeski Exs. D-E, ECF No. 35-7.

email to Lojeski stating that she had taken a cell phone belonging to Dominici from a psychiatric patient and that when she confronted Dominici about it, Dominici stated, "oh I was just letting them listen to music."  *See id.* ¶ 18.

On or about March 21, 2018, Lojeski and Operations Manager Loni Francis met with Dominici.  *See id.* ¶ 19.  Lojeski explained to Dominici that permitting a patient to utilize a cell phone without employee supervision presented a risk to the safety and welfare of the Hospital's psychiatric patients, who are not permitted to utilize communications devices without supervision.  *See id.* ¶ 20.  Although Dominici responded that she did not understand the severity of her conduct, she understood it was wrong.  *See* Lojeski Dec. ¶ 19; Francis Notes, Lojeski Ex. H, ECF No. 35-7.  Dominici also told Lojeski that she failed to understand the severity of her admitted conduct of clocking in and then moving her car.  *See id.*  Lojeski explained to Dominici that clocking in and then returning to her car constituted a "theft of time" because she was being paid for time that she was not working.  *See id.* and Lojeski Dec. ¶ 22.  Sherry Rex, a Human Resources Business Partner ("HRBP") at the Hospital, declares that the Hospital has maintained a policy that prohibits "theft, dishonesty (direct or by omission) or fraud of any kind[.]"  *See* Rex Dec. ¶ 17, ECF No. 35-9.  The Hospital has considered the act of clocking in before parking one's car to violate the aforementioned policy.  *See id.* ¶ 18.

The following week, on or about March 29, 2018, the Hospital issued Dominici a Final Written Warning regarding these violations, which states, in relevant part:

> On March 6, 2018 it was reported by staff that Lucia was clocking in for work and going back out to park in her car. After a thorough investigation it was discovered the employee continues to deviate from organizational and departmental policies. Lucia, allowed a group of patients to use her personal cell phone without supervision[,] jeopardizing the safety and welfare of the patients[.] In addition, when Lucia was asked about clocking in and parking her car on work time she admitted that she would swipe in for work then return her car and proceed to park in her assigned parking. This is resulting in a final written warning.

> The following improvement is expected to occur (Future):
> Lucia is expected to adhere to the [Hospital's] policies and procedures. Any future violations will result in termination of employment

Final Warning, Ex. 11, ECF No. 35-8. Lojeski and Nurse Manager Kelly Mohn issued the Final

Written Warning to Dominici during a meeting on March 29, 2018. *See* Lojeski Dec. ¶ 22; Pl.'s

Dep. 139:11-24. Dominici named one other employee that allegedly allowed a patient to use her

cell phone, but could not testify as to when or whether Lojeski was that employee's supervisor.

*See id.* 145:11 -147:15. Dominici is unaware of any other employee that Lojeski allowed to

clock in and then go park his/her car without being disciplined. *See id.* 141:23 - 142:3.

At the meeting on March 29, 2018, Dominici was wearing workout pants and a t-shirt.

*See* Lojeski Dec. ¶ 24. However, the Hospital maintained a dress code for employees working in

the Psychiatry Department, which states that "Appearance must be professional at all times."

*See* Lojeski Dec. ¶¶ 25-26 and Lojeski Ex. J, ECF No. 35-7. Immediately after the meeting,

Lojeski advised Dominici that her attire was not professional dress and she needed to change.

*See id.* ¶ 26; Pl.'s Dep. 156:8-19. Dominici went to Human Resources first, then after securing

different clothes, was permitted to return to work. *See* Lojeski Dec. ¶ 27; Pl.'s Dep. 158:1 -

160:10. Dominici testified that Lojeski had seen her dress similarly on previous occasions, but

did not discipline her, and also that Lojeski did not send other employees home for wearing

street clothes. *See* Pl.'s Dep. 165:17-24; SJ Resp. 3-4. When asked to name another employee

that was not disciplined for violating the dress code, Dominici referred only to a doctor that was

not supervised by Lojeski, and to unnamed staff members who wore "strange skirts, . . . makeup,

earrings, tattoos." *See id.* 163:10 - 164:24.

ii.     **Dominici's Fair Treatment Grievances**

At all times relevant, the Hospital maintained a Fair Treatment Policy pursuant to which non-management employees may make suggestions and discuss work-related problems with supervisors. *See* Rex Dec. ¶¶ 3-4; Rex Ex. A, ECF No. 35-9. In relevant part, the Fair Treatment Policy provides for a multi-step review of employee issues and permits the complaining employee to withdraw a complaint in writing at any time. *See id.*

Consistent with the Policy, Dominici provided Lojeski a document with the subject heading "Grievance." *See* Grievance; Pl.'s Dep. 73:1 - 75:4. Dominici submitted the Grievance on or about April 2, 2018, approximately four days after receiving her Final Written Warning. *See id.* The Grievance, a four-page, single-spaced document addressed to Lojeski, sets forth a number of discrete complaints, all arising after Lojeski took over as the nurse manager, including, in relevant part, the following:

> . . . I noticed that things changed fast, several coworkers lost their jobs and new rules and regulations were put into place.
> . . . All of the sudden the rules changed and now, all staff from P1 and [PG] needed to rotate.
> . . . I had numerus conversations with you with regard to this situation and you never gave me a credible reason why I was the only one that rotated and was always put in PG . . . . You kept making excuses and favored other co workers [such as Nicki Angelisanti][5] who did not rotate and were not honest about claiming it involved seniority. . . .

Grievance 1. Dominici writes to Lojeski: "Every time I approach you for any reason whether it be for requesting PTO, you always make me feel as though I am not understanding things." *Id.* at 2. She contends:

> . . . I never expected the work environment at the hospital to be so hostile & unfriendly. . . . I have been treated poorly by some of the staff to the point that I have been threatened & yelled at, which you are aware of. I have had my privacy invaded and have been picked on by several people who you are well aware of.

---

[5]     *See* Pl.'s Dep. 58:5-10.

. . . I have been bullied, intimidated and frankly targeted by you.

*Id.* at 2-3.

The Grievance also comments on the various alleged misconducts.  As to the dress code violation, Dominici asserts:

> . . . As a psych tech I wear regular clothing.  At times I go to the gym before working and on Thursday 3/29, this was the case. I was not wearing sweat pants, however[,] a very nice pair of black Adidas climate slacks and a nice t-shirt. There were many other times I have worn the exact same clothes and you never said anything. . . .
> . . . After you called me in the office for letting a patient listen to music on my phone, you called me right back and humiliated me for the clothing I was wearing.
> . . . Humiliating me in front of other staff for violating a dress code that I actually did not violate.

*Id.* at 2.  In addressing the written warning for allowing a visitor to see a patient that was not on the approved visitor list, Dominici states: "I never received a formal training on how to do visiting . . . it was a very busy environment . . . I also suggested [ways] to improve the situation. . . ."  *Id.* at 3.  Dominici also discusses the parking violation and offers a similar explanation for leaving her keys unattended that was discussed above.  *See id.*  As to the misconduct for permitting a patient to use her cell phone, Dominici complains to Lojeski: "you never responded to my email" about "tak[ing] a patient to the gym" and because "the television does not work," and "we do not have any radio's [sic] for appropriate usage," she allowed a patient to listen to music on her phone.  *See id.* at 3.  Dominici concludes the Grievance as follows:

> In conclusion; I would like to state that you have not followed the proper protocol for the issuance of a "corrective action warning notification" using the progressive discipline form. According to the policy for corrective action, the understanding of progressive discipline is a method of attempting to correct deficiencies through counseling, warning, representing or other forms of remedial action appropriate to the employee's behavior and the circumstances surrounding the behavior. Constructive methods of problem solving for the benefit of the patients, Reading Health System, and employees is to council [sic], discuss and frankly give the employee an opportunity to become educated as to how to correct, improve and understand what is need [sic] to satisfy management that they understand what is needed for improvement. Sending me home to change my clothing in my opinion,

> was NOT beneficial to the patients, Reading Health System and to me, and solved nothing. Especially since it wasn't even a justified violation of the dress code. Counseling before any written warning should have been done prior to any disciplinary action. Noel, this was not done. Grabbing the keys from the counter, when they were borrowed by a staff & put down for me while I was washing my hands, and then having them grabbed by you, solved nothing. A conversation with me about the importance of keeping your keys with you at all times would have been the appropriate thing to do. Not proceeding immediately to a disciplinary action. Counseling to me is approaching the employee to talk about the problem, educate the employee about a better way to do what was done wrong and wait and see for the future behavior. If you Noel, received information that I am repeating my previous behavior and wrong doing, then a written warning should be given. I feel that the two warnings you gave me were not appropriate based on the progressive counseling process of the hospital and the associated protocol. You should have provided me with the education and counseling necessary to understand what I did wrong. For this reason I feel that the two warnings that you gave me should be immediately annulled and withdrawn.

*Id.* at 3-4.  The Grievance asserts Dominici was treated differently and unfairly, and experienced a hostile work environment, but never alleges the disparate treatment or hostile environment was in any way connected to her age, race, national origin, or any other protected class.  *See generally id.*  Rather, Dominici questions "why" her coworkers would think Lojeski was targeting her and states "there is no reason for the treatment" she was receiving.  *See id.* at 2.

After reviewing Dominici's Grievance, Lojeski decided that it did not set forth any legitimate reason to rescind the First Written Warning or Final Warning and, on or about April 6, 2018, issued a determination upholding the discipline.  *See* Lojeski Dec. ¶ 37.  Lojeski's written response to the Fair Treatment Grievance states:

> I have read the Fair Treatment issue/complaint and uphold the decision of the final warning as the Behavioral and Performance Expectations Policy allows the manager to skip steps in the discipline process depending upon the circumstances of the performance issues.

Grievance Resp., Ex. 15, ECF No, 35-10.  Lojeski provided his response to Dominici, who understood that she had to proceed to the next step.  *See* Pl.'s Dep. 75:21 - 78:14.

On or about April 8, 2018, Dominici appealed Lojeski's decision through the Fair

Treatment Process to Lojeski's supervisor, Division Director Anne Blankenhorn.  *See id.* at

79:20 - 80:17; Grievance Appeal, Ex. 16, ECF No. 35-10.  The appeal states, in relevant part:

> I am in receipt of the response from my supervisor, Noel Lojeski . . . .
> Unfortunately, his response is unacceptable and discriminatory. He has failed to
> offer any reason as to why he has violated my rights to fair and equal treatment
> under the Hospitals [sic] "Fair Treatment Procedure" guidelines. Additionally, he
> has failed to follow proper steps in the progressive disciplinary action protocol.
> Instead, he has proceeded right to the final step of writing written warnings and
> threatening termination. This in itself is harassment and discriminatory. The
> circumstances of the issues involving the written warnings were not at all egregious.
> They were in fact quite minor and should have been handled with a counseling and
> educational conversation. Instead they were handled as an egregious incident and
> used as a form of harassment causing me both fear and anxiety. His managerial
> behavior towards me is one of constant harassment through negativity, fear and
> continual purposeful misunderstanding of communication.

*See* Grievance Appeal 1.  On or about April 12, 2018, Blankenhorn issued a written response to

Dominici's appeal, stating: "I have received all documents related to this fair treatment and

uphold the decision to discipline."  *See* Appeal Resp., Ex. 17, ECF No. 35-10; Pl.'s Dep. 91:16 -

92:20.  Although Dominici did not speak with Blankenhorn during the appeal process, she did

speak with Blankenhorn, about working on PG and her job duties, on at least two occasions prior

to beginning the Fair Treatment Process.  *See* Pl.'s Dep. 83:6 - 87:10.

Following her receipt of Blankenhorn's decision, Dominici met with Rex to discuss the

Fair Treatment Grievance.  *See* Pl.'s Dep. 94:16 - 98:20; Rex Dec. ¶¶ 3-8.  This was not the first

time they discussed the Fair Treatment Policy and Dominici's alleged mistreatment by Lojeski.

*See id.*  In their prior discussions, Dominici did not inform Rex of any alleged conduct that was

not included in her Grievance to Lojeski.  *See* Pl.'s Dep. 74:9-13.  During the meeting following

the denial of her Grievance Appeal, Dominici told Rex that she was "willing to drop" her Fair

Treatment Grievance because she "wanted to go to work and do [her] job and go home" and

"just wanted to be treated fairly." *Se id.* 96:1-9.  Dominici withdrew her Fair Treatment

Grievance on or about April 18, 2018.  *See* Rex Dec. ¶ 9; Rex Ex. C, ECF No. 35-9.  Dominici's

letter withdrawing the Grievance reads: "Per our conversation; I agree to drop the fair treatment

complaint against the hospital and Noel Lojeski at this time for your agreement to waive the

[]written warnings that were issued by Mr. Lojeski, and not use them against me in the future."

*See* Rex Ex. C.[6]

Neither the initial Grievance to Lojeski nor the written appeal to Blackenhorn alleged that

Dominici was discriminated against on the basis of age, race, or national origin.  Although

Dominici complained in the Grievance that Lojeski "favored other coworkers," she did not state,

or even insinuate, that the unfavored treatment was based on her membership in any protected

class, such as age, race, or national origin.  *See* Grievance.  Similarly, in her written appeal from

the Grievance, although Dominici alleged that Lojeski's treatment of her was "a clear act of

discrimination and harassment," she did not suggest that such allegedly discriminatory treatment

was based on her age, race, or national origin.  *See* Grievance Appeal.  It is unclear from

Dominici's testimony whether she mentioned Peterson's comment, which might suggest a basis

for the discrimination, to Rex when they were discussing the fair treatment complaint.  *See* Pl.'s

Dep. 100:20 - 101:20.  Rex declared, however, that Dominici never complained to Human

---

[6]     At her deposition, Dominici testified that Rex responded to Dominici's offer to drop the
complaint by saying that the written warnings would not be considered.  *See* Pl.'s Dep. 96:10 -
97:17.  Rex denies this, asserting that she "explained to Ms. Dominici that, while she could
appeal [Blackenhorn's] decision, all that she needed to do in order to avoid future disciplinary
action was to follow Hospital and departmental policies and procedures" and "[i]n response to the
same, Ms. Dominici stated that she agreed to withdraw her Fair Treatment Complaint and abide
by all applicable policies and procedures."  *See* Rex Dec. ¶¶ 8-10.  Rex further attests that she
does not have the authority to set aside any employee's progressive discipline.  *See id.*
        Although the reason Dominici withdrew her Fair Treatment Grievance is in dispute, this
disputed fact is not "material," nor does it create a "genuine" issue for trial.

Resources that she believed she had been mistreated by Lojeski or any other employee because of her age, race. or national origin.  *See* Rex Dec. ¶ 23.[7]

### iii.    Dominici's Termination

On July 26, 2018, a psychiatric patient utilized Dominici's ID badge to elope from Spruce Pavilion at approximately 10:00 P.M.  *See* Rex Dec. ¶¶ 12-13.  Around that time, Dominici asked Hospital Security officers if they had seen her hospital employee ID badge.  *See* Rex Dec. ¶ 13; Rex Ex. E, ECF No. 35-9.  Dominici informed them that she had left her badge on the nurse station desk and when she came back it was gone.  *See id.*  Hospital Security then called the command center to deactivate her ID, and learned that Dominici's ID badge had been used approximately eight minutes earlier on the east stairwell.  *See id.*  Dominici suspected which patient had taken her ID badge, but when Hospital Security officers checked outside, the patient could not be located.  *See id.*; Rex Ex. D, ECF No. 35-9.  Hospital Security officers thereafter contacted local police because the patient was supposed to be discharged the following day into the custody of the local sheriff.  *See id.*

Dominici entered a Progress Note into the Hospital's electronic medical record system at 10:38 P.M. on July 26, 2018, which provides in relevant part:

> [Patient] was noticed by the nurse station often this evening, appearing restless and asking for meds. The environment on the unit seemed very hostile, [patients] talking about not wanting to be there, talking loudly and using poor language. The [patient] of concern was noticed going up and down by the nurse station when this writer was at the computer trying to check some information by using the ID on the badge. As I was attempting to do so, a coworker showed me the art work ripped from the wall by another restless [patient]. My instinct was to go and help out my coworker and I left the badge by the computer. I assumed that this was the time the [patient] took my badge w/ the intention to leave the Unit and not thinking of the consequences from his action [sic].

---

[7]    Although this fact is therefore disputed, for the reasons set forth below, it is not "material" to the summary judgment analysis and does not create a "genuine" issue for trial.

*See* Rex Dec. ¶ 12; Rex Ex. D.  During her deposition, Dominici provided a similar explanation for her conduct and has never denied leaving her badge unattended.  *See* Pl.'s Dep. 174:8 - 175:8, 178:22 - 180:14.  At all times relevant, the Hospital maintained an ID Badge Policy that provides, "Badges are to be worn on outer clothing . . . . Employees must have their Photo ID and it must be legible and visible at all times."  *See* Rex Dec. ¶ 16; Rex Ex. F, ECF No. 35-9.

On the morning of July 27, 2018, Lojeski and Rex met to discuss how to proceed as to Dominici's misconduct.  *See* Lojeski Dec. ¶ 31; Rex Dec. ¶ 14.  Lojeski and Rex each declared that based on Dominici's admission and the fact that she was, at that time, on a Final Written Warning for conduct that posed a threat to patient safety and welfare, they recommended the Hospital terminate Dominici's employment.  *See id.*  Division Director Ann Blankenhorn approved of the recommendation.  *See* Rex Dec. ¶ 14.  Rex thereafter recommended Dominici's termination to, and received approval from, Vice President and Chief Nursing Officer Mary Agnew.  *See id.*  Executive Vice President and Chief Operating Officer Therese Sucher then made the final decision to terminate Dominici's employment.  *See id.*  Blankenhorn informed Dominici of the Hospital's decision to terminate her employment at a meeting the same day.  *See id.*; Lojeski Dec. ¶ 32.  At that meeting, Blankenhorn presented Dominici with a written termination notice stating: "On the evening of 7/26/18 Lucy [Dominici] left her identification badge unattended, this resulted in a patient elopement. This is a violation of the [ID] Badge Process Policy."  *See id.*; Termination Notice, Ex. 13, ECF No. 35-10.

During Lojeski's employment as Nurse Manager at Spruce Pavilion, no other employee left his or her ID badge in a location that permitted a psychiatric patient to elope from the Hospital.  *See* Lojeski Dec. ¶ 39.  Dominici testified she knows of one other patient that had eloped from the unit, but does not know how the patient escaped.  *See* Pl.'s Dep. 180:15 -

181:12.  She also does not know whether anyone was disciplined for this incident.  *See id.*
181:13-16.

### iv.     Dominici's Allegations of Discrimination and Retaliation

Dominici testified at her deposition that Blankenhorn discriminated or retaliated against
her because Blankenhorn "knew about the issues, the relationship, the harassment, the
discrimination that [Dominici] endured and she didn't do nothing about it."  *See* Pl.'s Dep.
176:8-17.  However, when asked whether Blankenhorn discriminated against her on the basis of
age, Dominici responded, "I don't know.  I don't really know.  I know that Noel did."  *See id.*
177:6-10.  Similarly, when asked whether Blankenhorn discriminated against her because she is
Italian, Dominici stated, "It's up to her.  I'm not talking about Ann [Blankenhorn] on this -- on
this -- on this complaint."  *See id.* 177:11-16.  Dominici was also questioned whether she
believed Blankenhorn discriminated against her on the basis of race, to which she answered: "I
can't say Ann [Blankenhorn] discriminated against me because of my race.  My complaint is
against Noel Lojeski."  *See id.* 178:2-8.  Dominici then testified that Lojeski is the only person
who allegedly discriminated against her on the basis of age, race, or national origin, and is also
the only person that allegedly retaliated against her.  *See id.* 178:9-13, 196:19-24.

As to her age discrimination claim, Dominici, who was born on January 6, 1960, *see* Pl.'s
SJ Resp. 1, ECF No. 38, mentioned in her deposition one alleged age-related comment by
Lojeski, *see* Pl.'s Dep. 191:5 - 194:23.  She testified that, at some unspecified time, Lojeski told
her that she was "too old to work on P1."  *See id.*  Dominici testified Lojeski made this comment
during an interaction in which she and Lojeski were looking at a schedule posted on the wall and
Lojeski asked if Dominici had completed an activity group, to which she replied it was not easy
for her to remember everything when she rotated between working day and night shifts.  *See*

Pl.'s Dep. at 191:5 - 192:19.  She did not report or complain about this comment to anyone.  *See id.* 193:3 - 195:5.  Dominici testified that Lojeski made one other memory-related comment to her.  *See id.* 194:13-16.  Dominici also complains that Lojeski did not require the "younger" Psych Tech Angelisanti to rotate shifts.  *See id.* 56:9 - 58:10.  Dominici could not testify as to how much younger Angelisanti is, nor is there any evidence as to Angelisanti's age.  *See id.* 54:15-23.  Dominici acknowledges Angelisanti had more seniority, which is the explanation Lojeski provided Dominici when questioned about the different schedules.  *See id.* 58:5-15, 191:15-18.

As to Dominici's claim that she was discriminated against on the basis of race and/or national original (European/Italian), Dominici, who was born in Italy, *see* Pl.'s SJ Resp. 1, testified she believed her termination "was discriminatory because of fair treatment and because [she was] from another country, Noel Lojeski abused his power because if it wasn't for all these frivolous issues that he gave a written warning to me, I probably have still my job," *see* Pl.'s Dep. 175:9-20.  She testified that Lojeski, who is of Italian descent,[8] would "mock" her and "have this smile on his face" when they spoke" and that her "impression was this man is really kind of ridiculing me."  *See id.* 186:13-187:1.  Dominici testified that Lojeski's behavior "was kind of ridiculous" and one day when she asked for a pass to go get some fresh vegetables, Lojeski handed her a banana.  *See id.* 187:9-14.  She further testified that on one occasion when she answered Lojeski's telephone call on the unit phone by saying "P1," Lojeski said "Oh, come on Lucy, P1" and then hung up the phone.  *See id.* 187:6 - 188:5.  Lojeski declares that he

---

[8]     Lojeski's grandmother spoke only Italian, and his mother maintains a home in San Lucido, Italy, where his family originated, and cousins still reside.  *See* Lojeski Dec. ¶ 35.  Lojeski's aunt and mother are fluent in Italian, and Lojeski is extremely proud of his Italian heritage.  *See id.*

instructed all unit employees to answer the phone in a professional manner by stating "Hello, P1/PG, how may I help you." *See* Lojeski Dec. ¶ 36.  However, Dominici testified that she was unaware of this instruction. *See* Pl.'s Dep. 188:11-14.[9]

With respect to the hostile work environment claim, in addition to this alleged harassment by Lojeski, Dominici testified two coworkers, Tracy Koch and Thomasine Peterson,[10] "continually harassed her" and complained she was not pulling her weight. *See id.* 102:4 - 103:24.  Dominici testified that prior to filing her Grievance someone, whom she believes to be Koch, informed Lojeski about comments Dominici posted to her Facebook page complaining that the duties she was being required to perform were against the rules. *See id.* 104:6 - 107:10.  Dominici also testified that at some unspecified time, Peterson said in reference to Dominici, "Look at that, she's standing there like a dope, go back to your country where you come from, we don't want you here." *See id.* 107:11-109:5.  Dominici testified that she told Lojeski about this alleged comment, Lojeski said that he would talk to the employee, and the employee never made any similar comments again. *See id.* 108:21-110:15.

As to her retaliation claim, Dominici testified that Lojeski's conduct was retaliatory because "every time [she] complained about the schedule, seems like after that, [she] receiv[ed] those warnings, those warnings.  Never counseling, never.  All always written warnings." *See* Pl.'s Dep. 197:1-5.

---

[9]     Whether or not Lojeski gave this instruction is not "material" for purposes of deciding this motion, nor does it create a "genuine" issue for trial.

[10]    Rex declares that the Hospital has no record of any employee by the name of "Thomasine Peterson." *See* Rex Dec. ¶ 24.  Although the existence of Peterson, and by extension her alleged comment and the report to Lojeski, is disputed, for the reasons discussed herein, this fact is not "material" because summary judgment is warranted even if Dominici's allegation is true.

At all times relevant, the Hospital maintained an Anti-Harassment Policy.  *See* Rex Dec. ¶ 19.  On or about April 3, 2017, Dominici attended a Respectful Workplace training and signed an acknowledgement of the Hospital's Anti-Harassment Policy.  *See* Ex. 19, ECF No. 35-10; Pl.'s Dep. 63:13 - 64:21.  The Hospital's Anti-Harassment Policy provides that employees who feel they are being harassed should first ask the offending party to stop the harassing behavior. *See* Rex Dec. ¶ 20.  Pursuant to the Hospital's Anti-Harassment Policy, if the offended employee does not feel comfortable asking the offending party to stop the harassing behavior, then the employee is to report the same to a supervisor, manager, or Human Resources.  *See id.* ¶ 21.  If the offending party is the employee's direct supervisor, then under the Hospital's Anti-Harassment Policy, the employee should report the harassing behavior to Human Resources or to the supervisor's supervisor.  *See id.* ¶ 22.

Aside from what has been discussed, Dominici never complained to Lojeski or to Human Resources that she believed she had been mistreated by Lojeski or by any other employee because of her age, race, or national origin.  *See* Lojeski Dec. ¶ 42; Rex Dec. ¶ 23.

### v.    Discipline to Other Employees

During the time period of Dominici's employment, the Hospital terminated the employment of other employees within the Department upon the recommendation of Lojeski for reasons similar to those for which Dominici received discipline.  *See* Lojeski Dec. ¶¶ 40-41.  For example, on or about February 14, 2018, upon Lojeski's recommendation, the Hospital terminated the employment of Holly Jones for failure to follow the departmental visitation policy.  *See id.*  Jones was not an Italian national and was approximately twenty-three years old at the time of her termination.  *See id.* ¶ 40; Lojeski Ex. M, ECF No. 35-7; Rex Dec. ¶ 26.  On or about June 8, 2017, also upon Lojeski's recommendation, the Hospital terminated the

employment of Cynthia King for theft of Hospital time and subsequent dishonesty.  *See* Lojeski

Dec. ¶ 41; Lojeski Ex. M, ECF No. 35-7; Rex Dec. ¶ 27.  King was not an Italian national and

was approximately thirty-one years old at the time of her termination.  *See id.*

Dominici also refers to an alleged incident with a Registered Nurse ("RN") by the name

of "Denise Jacobs."  According to Dominici, in late 2017, "Denise Jacobs" was performing a

medical task when a patient grabbed surgical scissors from Jacobs's hand and cut a surgically

implanted feeding tube.  *See* Am. Compl. ¶ 18, ECF No. 8.  Dominici alleges Jacobs was not

terminated for this incident.  *See id.*  Rex declares, however, that the Hospital has never

employed any person by the name "Denise Jacobs."  *See* Rex Dec. ¶ 25.  In opposition to the

Motion for Summary Judgment, Dominici refers to the RN as being named "Denise Jacobs

Ernesto."  *See* SJ Resp. 4.  In its reply brief, the Hospital states that "it has never denied that it

employed a nurse by the name of Denise Ernesto[; r]ather, the Hospital has consistently stated

that it lacks any record of a nurse named 'Denise Jacobs' and, with regard to Denise Ernesto, that

the Hospital has no knowledge of the allegations made by Plaintiff."  *See* SJ Reply 5 n.3.

Although Dominici was provided an opportunity to inspect the personnel file of Denise Ernesto,

she did not respond to this offer.  *See id.*[11]

## IV.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A disputed fact is "material" if proof of its existence or nonexistence might affect the

---

[11]     In the absence of any evidence to support Dominici's allegations in this regard, she has
failed to show that this disputed fact creates a "genuine issue."  Moreover, for the reasons
discussed herein, this disputed fact is not "material" to the outcome.

outcome of the case under applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  The court must consider the evidence in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

**B.**     **The Law Pertaining to 42 U.S.C. § 1981**

Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  To establish a basis for relief under section 1981 a plaintiff must show:

(1) he belongs to a racial minority;

(2) an intent to discriminate on the basis of race[12] by the defendant; and

(3) discrimination concerning one or more of the activities enumerated in § 1981.

*Estate of Oliva v. N.J., Dep't of Law & Pub. Safety, Div. of State Police*, 604 F.3d 788, 797 (3d

Cir. 2010) (quoting *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002)).[13]

"In employment discrimination cases, [§ 1981] claims are subject to the same analysis as

discrimination claims under Title VII of the Civil Rights Act of 1964."  *Castleberry v. STI Grp.*,

863 F.3d 259, 263 (3d Cir. 2017).

## C.       The Law Pertaining to Disparate Treatment

Federal law prohibits employment discrimination based on race, color, religion, sex,

national origin, age, and disability.  *See E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 448-49 (3d

Cir. 2015).  Disparate treatment claims brought under Title VII and the ADEA are analyzed

---

[12]      There is conflicting authority as to whether discrimination on the basis of national origin, as opposed to race, is actionable under § 1981.  *Cf. Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (holding that "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics [and s]uch discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory"); *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174 (3d Cir. 2020) ("Section 1981 of Title 42 of the United States Code also prohibits employment discrimination on the basis of race and national origin." (citing *St. Francis Coll.*, 481 U.S. at 609); *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 172 (3d Cir. 1991) (holding that discrimination on the basis of national origin "would not be sufficient for a § 1981 claim under *Al-Khazraji*" (citing *Saint Francis Coll.*, 481 U.S. at 613).

[13]      The Third Circuit Court of Appeals has also recognized a claim of reverse discrimination, for which the plaintiff must "present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII."  *See Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999).  "[T]o sufficiently allege a prima facie reverse discrimination claim, a plaintiff must allege facts to show that: (1) he or she was qualified for the position in question, (2) he or she suffered an adverse employment action, and (3) the evidence is adequate to create an inference that the adverse employment action [or less favorable treatment] was based on a trait protected by Title VII."  *Angelini v. U.S. Facilities, Inc.*, No. 17-4133, 2018 U.S. Dist. LEXIS 107615, at *15 (E.D. Pa. June 27, 2018) (internal quotations omitted).

using the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*See Rabinowitz v. AmeriGas Partners, L.P.*, 252 F. App'x 524, 527 (3d Cir. 2007).  "Under the

McDonnell Douglas paradigm, an employee must first establish a prima facie case of

discrimination, after which the burden shifts to the employer to articulate a legitimate,

nondiscriminatory reason for its adverse employment decision."  *Fasold v. Justice*, 409 F.3d 178,

184 (3d Cir. 2005).  The Third Circuit Court of Appeals has "defined 'an adverse employment

action' under Title VII as an action by an employer that is 'serious and tangible enough to alter

an employee's compensation, terms, conditions, or privileges of employment.'"  *Storey v. Burns*

*Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251,

263 (3d Cir. 2001)).  "If the employer articulates one or more such reasons, the aggrieved

employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find

by a preponderance of the evidence that the employer's proffered reasons are false or

pretextual."  *Id.*  "It is important to note that although the burden of production may shift during

the McDonnell Douglas inquiry, the ultimate burden of persuading the trier of fact that the

[employer] intentionally discriminated against the [employee] remains at all times with the

[employee]."  *Id. See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (explaining

that once the plaintiff establishes a prima facie case, the law creates a "presumption" of unlawful

discrimination, which is rebutted if the employer articulates a legitimate nondiscriminatory

explanation for the employer's action, but the "presumption does not shift the burden of proof,

and ignores our repeated admonition that the Title VII plaintiff at all times bears the ultimate

burden of persuasion").

        To establish a prima facie case of employment discrimination, a plaintiff must show that:

        (1) he is a member of a protected class;

(2) he was qualified for the position in question;

(3) he suffered an adverse employment action; and

(4) the adverse action occurred under circumstances giving rise to an inference of discrimination.

*See McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).  "The central focus in a discrimination case is "whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'"  *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15. (1977)).

To state a claim for age discrimination, a plaintiff must allege that:

 (1) he is over forty,

 (2) he is qualified for the position in question,

 (3) he suffered from an adverse employment decision, and

 (4) his replacement was sufficiently younger to permit a reasonable inference of age discrimination.

*Hill v. Borough of Kutztown*, 455 F.3d 225, 247 (3d Cir. 2006).  Alternatively, a plaintiff may establish a prima facie case of age discrimination by showing that younger employees were treated more favorably.  *Steinagel v. Valley Oral Surgery*, No. 12-cv-05645, 2013 U.S. Dist. LEXIS 141146, at *19-20 (E.D. Pa. Sept. 30, 2013).  "There is no magical formula to measure a particular age gap and determine if it is sufficiently wide to give rise to an inference of discrimination."  *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 699 (3d Cir. 1995) (explaining that case law assists the inquiry).

To avoid summary judgment, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either:

(1) disbelieve the employer's articulated legitimate reasons; or

(2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (holding that a plaintiff "may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action"). "[T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (internal citations omitted). "It is not sufficient to show that the employer's decision was wrong, mistaken, imprudent or incompetently made." *Rabinowitz*, 252 F. Appx. at 527. "In carrying his/her ultimate burden of persuasion in a pretext case, the employee must establish a basis from which the trier of fact can conclude by a preponderance of the evidence 'that there is a 'but-for' causal connection between the plaintiff's age and/or national origin and the employer's adverse [employment decision] - i.e., that age and/or national origin 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome of that process.'" *Rocco v. Am. Longwall Corp.*, 965 F. Supp. 709, 713 (W.D. Pa. 1997) (quoting *Miller v. CIGNA Corp.*, 47 F.3d 586, 595-96 (3d Cir. 1995)). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reason for its action that a reasonable factfinder could rationally find them

unworthy of credence and hence infer that the employer did not act for [the asserted] non-

discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal citations and quotations omitted).

"While this standard places a difficult burden on the plaintiff, 'it arises from an inherent tension

between the goal of all discrimination law and our society's commitment to free decisionmaking

by the private sector in economic affairs.'" *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-*

*Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

>    **D.      The Law Pertaining to Hostile Work Environment**

To establish a hostile work environment claim, the plaintiff must show:

(1) he suffered intentional discrimination because of his national origin, race, or age;

(2) the discrimination was pervasive and regular;

(3) it detrimentally affected him;

(4) it would have detrimentally affected a reasonable person of the same protected class

in his position; and

(5) there is a basis for vicarious liability.

*Cardenas*, 269 F.3d at 260; *Tate v. Main Line Hosps., Inc.*, No. 03-6081, 2005 U.S. Dist. LEXIS

1814, at *60-61 (E.D. Pa. Feb. 8, 2005).  In deciding whether an environment is "hostile," the

court may consider "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23

(1993).  Title VII "does not reach the ordinary tribulations of the workplace, for example,

sporadic use of abusive language or generally boorish conduct." *Vance v. Ball State Univ.*, 570

U.S. 421, 452 (2013) (internal quotations omitted).  "'[O]ffhanded comments and isolated

incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). A plaintiff claiming a hostile work environment based on regular and pervasive harassment must likewise establish that any harassment was due to her membership in a protected class or protected activity. *See Culler v. Sec'y of U.S. Veterans Affairs*, 507 F. App'x 246, 249 (3d Cir. 2012) (per curiam) (citing *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007)).

E.     The Law Pertaining to Retaliation

Federal law prohibits an employer from retaliating against an employee for opposing any act made unlawful by the employment discrimination statutes or because the employee made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under the employment discrimination statutes. *See E.E.O.C.*, 778 F.3d at 449. To establish a prima facie case of illegal retaliation, a plaintiff must show:

(1) protected employee activity;

(2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and

(3) a causal connection between the employee's protected activity and the employer's adverse action.

*See id.*; *Selvato v. SEPTA*, 658 Fed. Appx. 52, 56 (3d Cir. 2016) (internal quotations omitted). "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." *Moore v. City of Phila.*,

461 F.3d 331, 341 (3d Cir. 2006).  "Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII."  *Id.*  "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to advance a legitimate non-retaliatory reason for its conduct. If an employer advances such a reason, a plaintiff then must show that the proffered reason was a pretext for retaliation."  *State of Oliva*, 604 F.3d at 798.

## V.    ANALYSIS

### A.    Neither the allegations nor the evidence support a claim under § 1981.

The Hospital argues it should be awarded summary judgment on Dominici's § 1981 claim because her asserted race, "European," does not constitute a racial minority.  *See* SJ Mem. 4-6.  It also asserts that although the Third Circuit has recognized that a Caucasian plaintiff may assert a claim of "reverse discrimination" under § 1981, it has never recognized the ability of a European plaintiff to assert such a claim.  *See id.*  In her opposition, Dominici does not offer any legal authority to support the theory that being European, or Italian, is protected under § 1981.

Dominici claims she was discriminated against on the basis of being European and/or Italian, but does not allege that she was perceived as a non-white.  Accordingly, § 1981 offers no relief because Dominici does not belong to a racial minority.  *See Petrone v. Reading*, 541 F. Supp. 735, 738-39 (E.D. Pa. 1982) (dismissing the plaintiff's § 1981 claim, which was predicated upon his Italian heritage, because "there is no allegation that plaintiff is generally perceived as a non-white").  There are also no allegations of reverse discrimination.  Moreover, for the reasons discussed below, Dominici has offered no evidence to show the Hospital had an intent to discriminate on the basis of her race or that she endured any discrimination.

Summary judgment is entered in the Hospital's favor on Dominici's § 1981 claim.

### B.     Disparate Treatment

There is no dispute that Dominici is of a sufficient age and is qualified[14] for the Psych

Tech position.  Although the Hospital does not dispute that Dominici's termination was an

adverse employment action, it asserts her performance of PCA duties and her assignment to PG

as opposed to P1 do not constitute adverse employment actions.  *See* SJ Mem. 13-14 and n.2.

The Hospital does not clearly state its position as to whether the written warnings constitute

adverse action.  *See id.* 7-18 (citing, *inter alia*, *Walker v. Centocor Ortho Biotech, Inc.*, 558 F.

App'x 216, 219 (3d Cir. 2014) ("Employment actions such as lateral transfers and changes of

title or reporting relationships have generally been held not to constitute adverse employment

actions." (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)))).

"To pass the summary judgment standard, the adverse employment action must be

sufficiently severe and concrete to affect the compensation, terms, conditions, or privileges of

employment."  *Sconfienza v. Verizon Pa., Inc.*, 307 F. App'x 619, 621-22 (3d Cir. 2008).

Because Dominici was hired to work both day shift and night shift, the terms of her employment

were not affected by her shift schedule.  She was, however, hired to work on P1, and a Psych

Tech working on PG must perform more patient care duties.  Accordingly, the Court must

determine whether her assignment to rotate between P1 and PG was "adverse."  "To be sure,

reassignment of job duties is not automatically actionable.  Whether a particular reassignment is

materially adverse depends upon the circumstances of the particular case, and should be judged

---

[14]     *But see Nelson v. DeVry, Inc.*, No. 07-4436, 2009 U.S. Dist. LEXIS 38161, at *22-23
(E.D. Pa. Apr. 23, 2009) (concluding that the plaintiff could not establish the second element of a
prima facie case of discrimination because "[a]n employee who violates a company policy which
results in that employee's discharge is not meeting the employer's legitimate expectations").

from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 71 (2006) (internal quotations omitted).

A reasonable Psych Tech, whose written job description includes providing patient care to psychiatric patients and assisting patients with bathing, toileting, and feeding, *see* Ex. 4, would not find it materially adverse to have to perform the duties of the job. The undisputed facts show all Psych Techs working on PG perform these duties. Even if these duties are undesirable, there is no evidence to suggest a Psych Tech working on PG as opposed to P1 receives lower pay or is of a lower status. *See Henry v. City of Allentown*, No. 12-1380, 2013 U.S. Dist. LEXIS 172792, at *12-13 (E.D. Pa. Dec. 5, 2013) ("Assignment to different duties that are merely undesirable does not constitute constructive demotion if the duties are not of a sort normally given to a lower rank."). Dominici's job title and benefits did not change, nor did she experience a reduction in pay by rotating to PG. *See Burlington Indus.*, 524 U.S. at 761-64 (holding that an adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," but a "demotion without change in pay, benefits, duties, or prestige insufficient," "reassignment to [a] more inconvenient job," and a "bruised ego is not enough"). Further, while Dominici found these duties undesirable, she only had to perform them while working on the more desirable day shift. Dominici has therefore failed to present evidence to establish that working two weeks each month on PG, which involved PCA duties, was sufficiently "severe and concrete to affect the compensation, terms, conditions, or privileges of employment." *See Sconfienza* , 307 F. App'x at 621-22.

Also not an adverse employment action was Dominici's verbal reprimand for a dress code violation, which led to no formal disciplinary action or change in pay, benefits, or employment terms. *See Leftwich v. Lew*, No. 15-300, 2015 U.S. Dist. LEXIS 166725, at *19 (E.D. Pa. Dec. 14, 2015) (holding that "performance improvement plans, negative reviews, verbal reprimands, and 'write-ups' do not constitute adverse employment actions under Title VII without some change to pay, benefits or employment status"). Although written warnings, in general, are not necessarily adverse actions, *see Deans v. Kennedy House, Inc.*, 587 F. App'x 731, 734 (3d Cir. 2014) (holding that the oral and written warnings did not constitute adverse employment action because they would remain in his file only temporarily and did not effect a material change in the terms or conditions of employment), in light of the declarations of both Lojeski and Rex that their recommendations to terminate Dominici's employment were influenced by the fact Dominici was on a Final Written Warning for conduct that posed a threat to patient safety, *see* Lojeski Dec. ¶ 31; Rex Dec. ¶ 14, the written warnings here are sufficiently adverse. *See Allen v. Nutrisystem, Inc.*, No. 11-4107, 2013 U.S. Dist. LEXIS 59650, at *16 n.6 (E.D. Pa. Apr. 25, 2013) ("When a warning is part of a progressive disciplinary policy such that each previous infraction raises the penalty for a subsequent infraction, courts in the Third Circuit have classified it as an adverse employment action."). *Accord Weston*, 251 F.3d at 431 (finding that the written reprimands were not adverse because the plaintiff "suffered no reduction in pay, reassignment, firing, or any similar employment action"). The evidence therefore shows that the written warnings, in addition to Dominici's termination, are adverse employment actions.

### 1.   Dominici has failed to show a prima facie case of age discrimination.

There is no evidence regarding Dominici's replacement; therefore, the only way to make a prima facie case is for Dominici to establish that younger employees were treated more

favorably.  She has failed to do so.  Although Dominici alleges other employees committed the

same conduct for which she received a verbal reprimand and written warnings, she is unable to

name any such employees, let alone provide information as to the age (or race or national origin)

of these employees.  Thus, they are not proper comparators.  *See Gutknecht v. SmithKline*

*Beecham Clinical Labs.*, 950 F. Supp. 667, 677 n.13 (E.D. Pa. 1996) (concluding the evidence

did not show that similarly situated younger employees were treated more favorably where the

plaintiff failed to produce evidence that the three alleged comparators were similarly situated in

terms of their seniority, performance evaluations, and other relevant factors).

Also not a relevant comparator is RN Ernesto.  Her alleged conduct, assuming it is true,[15]

was not a violation of any Hospital policy.  According to Dominici, a patient took surgical

scissors from Ernesto's hand, the patient did not take them because Ernesto left the scissors

unattended.  This alleged conduct was therefore not as serious as Dominici's decision to leave

her ID badge unattended, in violation of Hospital policy, in an area that a patient was able to take

it without being seen and flee the Hospital before Dominici even reported her badge missing.

Moreover, Dominici fails to offer any evidence or allegations as to the age of Ernesto, or details

about her disciplinary record, if any.  *See Young v. City of Phila. Police Dep't*, 651 F. App'x 90,

99 (3d Cir. 2016) (concluding that even if the alleged comparators' conduct is comparable, there

is no evidence that either of the comparators had similar disciplinary records; therefore, they

were not relevant comparators).

---

[15]     Although the Hospital disputes that this incident occurred, Dominici's allegations, if true, nevertheless fail to support a prima facie case, such that there is no "genuine" issue of "material" fact in this regard.

To the extent Dominici offers Lojeski as a comparator,[16] he may not "be used for the purpose of demonstrating discrimination because he was not similarly situated, as he and Dominici hold different positions, different levels of seniority, have different supervisors, and did not commit the same conduct. *See Durst v. City of Phila.*, 798 F. App'x 710, 713 (3d Cir. 2020) ("Relevant factors include whether the comparators had the same supervisor, were subject to the same standards, and had engaged in similar conduct.").  Dominici also fails to provide evidence regarding the age of Lojeski at the time of these alleged misconducts.

Dominici also provides no information as to the age of Psych Tech Angelisanti. Dominici alleges only that Angelisanti is "younger," which is insufficient.  *See Andy v. UPS*, 111 F. App'x 670, 670-71 (3d Cir. 2004) (affirming the district court's conclusion that the plaintiff, who was fifty-two years old when he was terminated, had not made out a prima facie case of age discrimination where his replacement was seven years younger); *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998) (holding that "the mere favorable treatment of one younger manager as compared to one older manager may not be sufficient to infer age discrimination"). Regardless, the undisputed evidence shows that Angelisanti had more seniority than Dominici and is therefore not a relevant comparator.  *See McKenna v. Healthease, Inc.*, No. 10-3940, 2013 U.S. Dist. LEXIS 56083, at *25 (E.D. Pa. Apr. 18, 2013) (determining that a reasonable factfinder has no basis to make an inference of discrimination where the alleged comparator had more seniority).  A "decision adversely affecting an older employee does not become a discriminatory decision merely because one younger employee is treated differently.  The

---

[16]     Dominici asserts that Lojeski issued the wrong medications to a patient, left work without clocking out, and took leave without advanced notice, but received written warnings with counseling and not termination.  *See* SJ Resp. 4; Sur-Reply SJ 3, ECF No. 41.

ultimate inquiry is whether the decision was motivated by the affected employee's age." *Simpson*, 142 F.3d at 645-46 (internal citations omitted).

Dominici also offers no evidence to show that Lojeski's actions were motivated by Dominici's age (or race or national origin). The undisputed evidence shows that Lojeski made, at most, two age-related comments to Dominici: one about her age and one about her memory. At that time, however, Dominici was already working on PG. Even if Dominici's assignment to PG, and the PCA duties associated therewith, were adverse employment actions, Dominici offers no evidence to connect such assignment to discrimination because the assignment occurred "[r]ight after Noel Lojeski took his managerial duties." *See* Pl.'s Dep. 54:14-19. There is also no evidence as to when these comments were made or to connect these comments to either the written warnings or Dominici's termination. "Stray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold*, 983 F.2d at 545. With no other evidence that Lojeski's decisions were motivated by Dominici's age, she has failed to make a prima facie case of age discrimination. *See Keller v. Orix Credit All.*, 130 F.3d 1101, 1111-14 (3d Cir. 1997) (granting summary judgment to the employer because the employer's comments to the plaintiff-employee, "If you are getting too old for the job, maybe you should hire one or two young bankers," which was made approximately four months before the employee was discharged and did not refer to the termination decision, was insufficient to establish that age was a determinative factor in the termination). This alone is a sufficient basis to grant summary judgment in favor of the Hospital on the ADEA claim.

**2.     Dominici has failed to establish a prima facie case of discrimination on the basis of race or national origin.**

For many of the reasons just explained, Dominici has also failed to establish a prima facie case of discrimination based on race and/or national origin.  Dominici's proposed comparators fail for the reasons discussed above and she offers no additional comparators to her race and national original claims.[17]  Further, the undisputed evidence shows that Lojeski never made any derogatory comments to Dominici about being European or Italian.  Although Dominici believes Lojeski was "mocking" her at times, she offers no evidence to connect any of this perceived behavior to her race or national origin, or to any of Lojeski's allegedly adverse actions.  Moreover, Lojeski is also of Italian descent.  *See Elwell v. PP&L, Inc.*, 47 F. App'x 183, 189 (3d Cir. 2002) (holding that the employee's discrimination case was weakened by the fact that the supervisor allegedly discriminated against him was a member of the employee's protected class).

The only statement Dominici contends anyone at the Hospital made pertaining to either her race or national origin was made by her coworker, Peterson,[18] who lacked any decision-making authority.  *See James v. Tri-Way Metalworkers, Inc.*, 189 F. Supp. 3d 422, 438 (M.D. Pa. 2016) (granting summary judgment in favor of the defendant because the plaintiff did not present any evidence of an alleged animus on the part of any decision maker).  Dominici offers no evidence as to when this comment was made.  There is also no evidence to connect this comment to Lojeski's decisions to issue written warnings or to recommend her termination (or to assign her to work on PG).  *See Sarullo*, 352 F.3d at 798 (agreeing with the district court that the

---

[17]     Although Lojeski's race and national origin are not identical to Dominici's, the evidence shows that Lojeski is of Italian heritage. However, Lojeski is not a relevant comparator due to his position, seniority, and misconduct, as previously discussed.

[18]     Although the Hospital disputes that it employed someone named Thomasine Peterson, Dominici's allegations, if true, nevertheless fail to support a prima facie case, such that there is no "genuine" issue of "material" fact in this regard.

plaintiff failed to make a prima facie case of race discrimination where he offered little more than his own affidavit that some of his coworkers and supervisors called him derogatory nicknames referencing his Native American heritage); *LaRochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 681 (E.D. Pa. 2016) (concluding that although the coworker's "name calling is certainly inappropriate, it does not create evidence showing that Defendants' decisionmakers fired [the employee] because of her gender").  Rather, after Dominici told Lojeski about Peterson's comment, Lojeski said that he would talk to Peterson.  Afterward, Peterson never made any similar comments again, which further separates Peterson's statement from Lojeski's actions. *See Peake v. Pa. State Police*, 644 F. App'x 148, 151 (3d Cir. 2016) (affirming the district court's decision that the plaintiff had not made out his prima facie case for race discrimination because he could not show a causal link between his membership in a protected class and the adverse employment action).  There is also no evidence connecting Dominici's report, if true, of this comment to Rex during the fair treatment process to her termination three months later.  *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing a case that determined a three-month gap between the employer's knowledge of protected activity and an adverse employment action was insufficient evidence of causality to establish a prima facie case).  Consequently, Dominici has not made out a prima facie case of discrimination on the basis of race or national origin.  Dominici's failure to make a prima facie case of discrimination on the basis of her race or national origin is grounds to grant summary judgment in the Hospital's favor.

The Court will nevertheless continue the McDonnell Douglas inquiry on all of Dominici's disparate treatment claims.

### 3.   The Hospital has presented legitimate, non-discriminatory reasons for Dominici's written warnings and termination.[19]

Assuming Dominici had made a prima facie case of discrimination, the Hospital can

nevertheless rebut the presumption of unlawful discrimination because it has articulated

legitimate, nondiscriminatory reasons for the written warnings and Dominici's termination.[20]

---

[19]      The Hospital has also presented a legitimate, nondiscriminatory reason for Dominici's assignment to PG and to PCA duties.  The undisputed evidence shows that prior to any changes in Dominici's floor and duty assignments, Lojeski informed all employees that they would need to rotate between PG and P1.  Dominici testified that Psych Techs working on PG have to perform PCA duties, which is consistent with Lojeski's declaration that under his management, "all Psych Techs were expected to perform the job duties of the PCA position, which duties also were associated with the Psych Tech position, and to work in a PCA role as assigned when staffing needs so required."  *See* Lojeski Dec. ¶ 6.  Although Dominici disputes Lojeski's contention that he gave priority to more senior Psych Techs as to their preferred floor, she offers no evidence to support her belief that the assignments were discriminatory.  Rather, she admits that all the other Psych Techs with whom she worked were more senior.  Consequently, the Hospital has asserted legitimate, nondiscriminatory reasons for Dominici's floor and duty assignments.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000) (holding that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred")

[20]      In response to the summary judgment motion, Dominici repeatedly complains that the Hospital did not produce any evidence that Lojeski had the authority to act.  This is not relevant to the summary judgment analysis.  Moreover, it is incorrect.  The written job description for the Psych Tech position states that nothing "restricts management's right to assign or reassign duties and responsibilities to this job at any time."  *See* Ex. 4 at 2.  *See also* Lojeski Dec. ¶ 9 (stating that "the Hospital has had the prerogative to assign Psych Techs (and other employees) to either floor in the Spruce Pavilion, as well as to specific locations on those floors, consistent with the staffing needs of the Hospital").  The Hospital's policy on Behavioral and Performance Expectations provides that managers shall "assess behavior," "may use . . . Written Warning [and] Final Written Warning," and may make a "recommendation to terminate employment." *See* Rex Ex. F.  In addition to these written Hospital policies, the fact the Final Written Warning was presented to Dominici by Nurse Manager Mohn is evidence of Lojeski's authority.  Similarly, her Grievance Appeal was denied by Lojeski's supervisor.  As to Dominici's termination, the decision was not Lojeski's.  Rather, both he and Rex "recommended" Dominici's termination to Blankenhorn, the recommendation was then considered by the Vice President and Chief Nursing Officer, and then ultimately determined by the Executive Vice President and Chief Operating Officer.

Lojeski issued the First Written Warning to Dominici for three infractions: failing to park in an assigned parking area; failing to follow the Hospital's visitor policy by allowing unapproved visitors on the unit; and failing to keep her unit keys secure at all times. Because Dominici violated Hospital policies, Lojeski had a legitimate, non-discriminatory reason for issuing the First Written Warning. *See DeCicco v. Mid-Atl. Healthcare, LLC*, 275 F. Supp. 3d 546, 555-56 (E.D. Pa. 2017) (recognizing that "violation of internal company policies may constitute facially legitimate, non-discriminatory reasons for termination"). Further, because Lojeski explains that the latter two infractions posed a risk to patient safety and welfare, he has provided a legitimate, non-discriminatory reason for issuing the First Written Warning and for skipping the counseling option. *See McLean v. Abington Mem'l Hosp.*, No. 15-671, 2015 U.S. Dist. LEXIS 122495, at *11-12 (E.D. Pa. Sep. 15, 2015) (finding that the hospital offered a legitimate, nondiscriminatory reason for terminating the plaintiff, a medical technologist, because her errors posed a threat to patient safety); *George*, 2014 U.S. Dist. LEXIS 51690, at *16-17 (holding that an employee's misconduct which affects safety is cause to skip earlier steps in a progressive disciplinary system).

The Final Written Warning was based on two infractions: punching in for work at the time clock and then leaving the facility to park her car; and allowing a psychiatric patient to use her cell phone while unattended. Both infractions violated Hospital policy/practice. Because Dominici violated Hospital policies, Lojeski had a legitimate, non-discriminatory reason for issuing the Final Written Warning. *See DeCicco*, 275 F. Supp. 3d at 555-56. These violations occurred approximately one month after Dominici received the First Written Warning. Given Dominici's additional policy violations and continued conduct that posed a risk to the safety and welfare to patients, Lojeski has presented a legitimate, non-discriminatory reason for

issuing the Final Written Warning.  *See DeCicco*, 275 F. Supp. 3d at 555-56; *Zalenski v. Wilkes-Barre Hosp. Co., LLC*, No. 3:15-CV-2428, 2017 U.S. Dist. LEXIS 134232, at *31-32 (M.D. Pa. Aug. 21, 2017) (determining that the hospital demonstrated a legitimate reason for terminating that plaintiff because she "had a work history that was marked by dozens of infractions, violations, write-ups, counseling, and even suspensions, many of which related directly to concerns over the plaintiff's violations of patient safety and identification protocols").

The Hospital has also presented a legitimate, non-discriminatory reason for terminating Dominici's employment.  Specifically, Dominici left her ID badge unattended, in violation of Hospital policy that required ID badges to be worn on outer clothing at all times, and a psychiatric patient was able to take her badge and use it to elope from the Hospital.  This incident occurred approximately four months after Dominici was issued the Final Written Warning, which advised: "Any future violations will result in termination of employment."  *See* Final Warning.  Considering the serious nature of the infraction that not only posed a risk to patient safety and welfare, but actually resulted in the patient's elopement, as well as Dominici's prior violations, the Hospital terminated Dominici's employment.  The Hospital has therefore presented a legitimate, non-discriminatory reason for its decision.  *See Jeffrey v. Thomas Jefferson Univ. Hosps., Inc.*, No. 17-0531, 2019 U.S. Dist. LEXIS 81493, at *17 (E.D. Pa. May 14, 2019) ("In a hospital setting, where patient safety is a 'universal standard,' it is perfectly legitimate for a nurse to be fired for endangering the life of a patient . . . ."); *Riley v. St. Mary Med. Ctr.*, No. 13-7205, 2015 U.S. Dist. LEXIS 135988, at *41 (E.D. Pa. Oct. 6, 2015) (concluding that, particularly given the serious nature of the plaintiff-nurse's job responsibilities, the hospital set forth legitimate and non-discriminatory reasons for terminating her employment,

including her failure to improve her performance after numerous verbal and written warnings,

and ongoing patient safety concerns).

4.      **Dominici offers no basis that would allow a jury to conclude that the reasons articulated by Lojeski and the Hospital for taking adverse employment action are untrue, nor points to evidence that a discriminatory reason (age, race, or national origin) was the actual motivation for the actions.**

Although Dominici disputes the seriousness of her actions, suggesting the violations were

"trivial," and fails to understand their impact,[21] she generally admits to committing the conduct

for which she was cited and terminated.  Accordingly, Dominici offers no reason to disbelieve

the Hospital's articulated reasons and, instead, gives credibility to its rationale.  *See In re Tribune*

*Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (holding that where the employee admitted to

engaging in conduct that violated the employer's policies, there was no basis to discredit the

employer's explanation for its employment decision and "[i]nstead, it lends credibility to the

[employer's] rationale"); *Willis*, 808 F.3d at 647-48 (holding that the employee, although

---

[21]      Dominici's complaint that Lojeski did not specify how she endangered patients by her conduct is frivolous.  If Dominici does not understand through basic common sense that permitting unauthorized visitors to see psychiatric patients and leaving her ID badge (or keys) unattended where a patient might take it and leave a locked building endangers patient safety, no explanation will ever suffice.  Dominici's continued failure to grasp the problem with clocking in for work and then leaving is also befuddling.  The instant action is nothing more than evidence of Dominici's continued inability to recognize the seriousness of her behavior.  *See McLean*, 2015 U.S. Dist. LEXIS 122495, at *11-12 (rejecting the argument of the plaintiff, a medical technologist, that her errors were not severe enough to be a significant risk because they did not actually result in harm to a patient); *Haas v. Wyo. Valley Health Care Sys.*, 553 F. Supp. 2d 390, 401 (M.D. Pa. 2008) (holding that the "fact that this particular incident did not result in harm to the patient does not establish that [the doctor] did not pose a direct threat to his patients[, as] the question is whether an occurrence of such an episode could result in harm to a patient").

Dominici simply wants to play the blame game.  She argues, for example, that other employees allowed unlisted visitor's in and blames a poor visitor-list system.  *See* Pl.'s Resp. to Def. First Set of Interrogatories ¶ 10, Ex. 10, ECF No. 35-8; Pl.'s Grievance dated April 2, 2018 at 3.  Dominici also asserts that the Hospital is responsible for the patient's escape because it failed to tell Dominici that the patient was a high risk for elopement, even though she admittedly recognized the restlessness of the psychiatric patient "going up and down by the nurse station" where she left her badge unattended in violation of Hospital policy.  *See* SJ Resp. ¶ 12.

attempting to excuse or mitigate her actions, admitted to committing the conduct for which she

was terminated and could not show that the employer's reason for its decision was "so weak as

to render it unworthy of credence"); *Norman v. Kmart Corp.*, 485 F. App'x 591, 593 (3d Cir.

2012) (determining that because the employee admitted to committing the charged violations,

she could not show the employer's proffered reason was false).

The only way to survive summary judgment is for Dominici to point to evidence that

would allow a jury to believe that an invidious discriminatory reason was a motivating or

determinative cause of the employment actions. As discussed previously, however, Dominici

offers nothing more than her own assumptions of discriminatory intent, which is insufficient.

*See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 853-54 (3d Cir. 2016) (concluding that the

employee's "assertion that her admitted misconduct and performance issues are pretext since

other employees engaged in similar conduct and did not face discipline are bare assertions, and

are insufficient under this Court's precedent to prove pretext"). Dominici cites to at most two

comments by Lojeski pertaining to her age, and none relating to her race or national origin.

These comments, unlike the written warnings and termination notice that were issued within

days of Dominici's violations, occurred at some unknown time prior and do not show pretext.

*See Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 558-59 (3d Cir. 2009) (concluding that stray

remarks made seven months before the plaintiff's termination were not evidence of pretext).

Dominici did not report Lojeski's statements to anyone, nor has she presented evidence of any

discriminatory statements or conduct by Rex, Blankenhorn, or any other decisionmaker. *See*

*Dove v. Cmty. Educ. Ctrs., Inc.*, No. 12-4384, 2013 U.S. Dist. LEXIS 170081, at *59-60 (E.D.

Pa. Dec. 2, 2013) (determining that the plaintiff failed to meet his burden of proving that the

defendant's legitimate, non-discriminatory reason for terminating him, his violation of employer

policy resulting in a safety threat, was pretextual because there was no evidence that "any of the supervisors who were aware of or commented on his disability were actual decisionmakers for his termination, or even that those supervisors bore any demonstrable discriminatory animus towards Plaintiff [and he had] not shown that his admitted violation of [employer] policy was disciplined more harshly than violations occurring under like circumstances").  Also insufficient to establish pretext is the one comment pertaining to Dominici's race and/or national origin made by a coworker.  *See Ezold*, 983 F.2d at 545 (finding that remarks made by a non-decisionmaker, while inappropriate, were not sufficient to show pretext of the firm's promotion decision).

Dominici's failure to point to a relevant comparator to support a prima facie case of discrimination further weakens her pretext argument.  *See Simpson*, 142 F.3d at 646 (holding that while there may be an "inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, . . . at the prima facie stage of the analysis," such inference is not necessarily appropriate "at the pretext stage where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity").  As discussed, Dominici's named comparators, for whom there is insufficient information, do not show pretext because, *inter alia*, Angelisanti is more senior than Dominici and Ernesto's misconduct was not as serious as that leading to Dominici's termination.  *See Norman*, 485 F. App'x at 593-94 (concluding that the employee offered no evidence that would permit a reasonable factfinder to find the employer's real motivation for terminating her was age or gender as the employees to whom she points were not similarly situated because they either were her subordinates or did not commit violations of the same scope and scale).

Dominici also fails to present any comparators regarding whom Lojeski skipped the counseling step of the Hospital's progressive disciplinary policy that might establish pretext.  *See*

*Edgerton v. Wilkes-Barre Home Care Servs., LLC*, 600 F. App'x 856, 859 (3d Cir. 2015) (rejecting the employee's attempt to discredit the employer's proffered justification by referring to another employee that was given the benefit of the employer's progressive discipline policy, while the plaintiff-employee was not, because the other employee's conduct was less serious); *Brasher v. Thomas Jefferson Univ. Hosps.*, No. 13-4103, 2015 U.S. Dist. LEXIS 171038, at *26-27 (E.D. Pa. Dec. 22, 2015) (distinguishing the employee's comparator in the pretext stage because the hospital's procedures allow a supervisor to skip one of the progressive disciplinary steps based on, *inter alia*, the nature of behavior and the ramification for patient care and safety, whether the behavior was an isolated occurrence, and the employee's disciplinary records). Moreover, given Lojeski's explanation that Dominici's behavior posed a risk of safety to Hospital patients, Dominici has failed to show that Lojeski's decision to issue written warnings instead of counseling was pretext for discrimination.  *See Lamb v. Montgomery Twp.*, No. 15-6759, 2016 U.S. Dist. LEXIS 177927, at *37 (E.D. Pa. Dec. 23, 2016) (concluding that the employer's failure to utilize the progressive disciplinary policy did not undermine its proffered rationale for its actions because the policy did not guarantee any specific termination procedure); *George v. Lehigh Valley Health Network (Muhlenberg Hosp.)*, No. 12-2239, 2014 U.S. Dist. LEXIS 51690, at *16-17 (E.D. Pa. Apr. 15, 2014) (holding that even if the hospital's disciplinary options were "a strict progressive sequence," the plaintiff, a radiologic technologist, could have been terminated earlier because her angry outbursts affected the safety and peace of mind of other employees).

     Further weakening Dominici's arguments of pretext is the fact that the Hospital terminated the employment of other employees upon the recommendation of Lojeski for reasons similar to those for which Dominici received discipline.

For all these reasons, summary judgment is granted in the Hospital's favor on Dominici's disparate treatment claims.

### C.       Hostile Work Environment

There is no evidence that the isolated comments by Lojeski, even when coupled by his allegedly "mocking" behavior, were so frequent or severe as to create a hostile work environment.  *See Harris*, 510 U.S. at 21 (holding that a "mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment to implicate Title VII" (internal quotations and citations omitted)); *LaRochelle*, 210 F. Supp. 3d at 694-95 (concluding where, *inter alia*, a supervisor repeatedly called the employee (a nursing assistant) a "stupid immigrant" and a "bitch," stated that "all aliens should be made to return to their countries," and instructed coworkers not to work with the employee, and, also, where a coworker refused to work with that employee and ridiculed the way she spoke English, that "[e]ven taken as a whole, these comments and isolated incidents do not rise to the level of severity or pervasiveness necessary to sustain a hostile work environment claim").  Moreover, there is no evidence to support Dominici's argument that such behavior was based on her age, race, or national origin.  *See Ortiz v. Delta Dental of Pa.*, No. 1:18-CV-456, 2020 U.S. Dist. LEXIS 40242, at *45 (M.D. Pa. Mar. 6, 2020) (holding that an employee's subjective apprehensions based on personal feelings, "without more, are insufficient to indicate a hostile work environment"); *Lucas v. City of Phila.*, No. 11-4376, 2013 U.S. Dist. LEXIS 70689, at *33 (E.D. Pa. May 17, 2013) (holding that "mistreatment that is not motivated by the plaintiff's protected class, but rather by a bad working relationship or mistaken belief of insubordination does not create a hostile work environment").  For the reasons discussed above, there is also no evidence that Lojeski, in assigning the PG floor and PCA duties to Dominici, or in issuing her

written warnings, or in recommending her termination, created an abusive environment.  *See Bartos v. MHM Corr. Servs.*, No. 3:09-CV-1018, 2011 U.S. Dist. LEXIS 167165, at *12-13 (M.D. Pa. Mar. 18, 2011) (concluding that the plaintiff's being disciplined for a series of discrete violations of the employer's policies were not tantamount to a pervasively abusive environment").

Lojeski's behavior, even when coupled with that of Dominici's coworkers, did not create a hostile work environment.  Aside from the one comment by Peterson telling Dominici to go back home to her country, Dominici offers no evidence to suggest that her coworkers' "harassing" behavior was due to her membership in a protected class.  Instead, the coworkers "harassed" Dominici for not pulling her own weight.  *See Hanna v. Giant Eagle Inc.*, No. 15-1009, 2017 U.S. Dist. LEXIS 34699, at *59-60 (W.D. Pa. Mar. 9, 2017) (concluding that being called "stupid," "lazy," and "spacey" were not connected to racism and the employee's "difficult or unpleasant working conditions do not rise to the level of being so intolerable that a reasonable person would be forced to quit").  "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  "[C]onduct that is merely offensive or which has the effect of making an employee's life at work unpleasant or uncomfortable is, without more, not actionable."  *Lucas*, 2013 U.S. Dist. LEXIS 70689, at *33. Dominici offers no evidence regarding the frequency of such comments, nor any evidence to suggest that they were severe or physically threatening, or that it interfered with Dominici's work performance.  *See Hamm v. Cent. Bucks Sch. Dist.*, NO. 92-6721, 1994 U.S. Dist. LEXIS 16304, at *35-36 (E.D. Pa. Nov. 15, 1994) (determining that the employee, who was referred to as "lazy" and was "snubbed" for filing suit, did not present evidence of conduct of such a nature

or frequency as required to sustain a hostile work environment claim).  Further, after Dominici

reported Peterson's comment about returning to her country to Lojeski, who said he would speak

with the employee, no other similar comments were ever made.  *See Huston v. P&G Paper*

*Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (holding that where the alleged harassment did

not occur by a supervisor, "employer liability for co-worker harassment exists only if the

employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer

knew or should have known of the harassment and failed to take prompt and appropriate

remedial action").  Considering all the working conditions, the Court finds that Dominici has not

provided evidence of "discrimination [that] was pervasive and regular."

      Consequently, summary judgment is granted in the Hospital's favor on Dominici's

hostile work environment claim.

### D.     Retaliation

      Dominici has not presented any evidence to show a prima facie case of retaliation.  As to

the first factor, assuming for purposes of this Opinion that Dominici's testimony is true[22] about

Peterson's comment telling her to go back to her country and that she reported this comment to

Lojeski and to Rex, the reports might be considered protected activity.  *See Crawford v. Metro.*

*Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009) ("When an employee

communicates to her employer a belief that the employer has engaged in . . . a form of

employment discrimination, that communication virtually always constitutes the employee's

opposition to the activity." (internal quotations omitted)); *Hoff v. Spring House Tavern*, No. 13-

0662, 2013 U.S. Dist. LEXIS 78782, at *15-16 (E.D. Pa. June 4, 2013) (holding that the plaintiff

---

[22]     Although the Hospital disputes this fact, because Dominici's claim would otherwise fail, it is not an obstacle to summary judgment because there is not a "genuine" issue of "material" fact.

"engaged in protected conduct when he reported to his employer racially derogatory comments made by his coworkers"). *But see Obergantschnig v. Saw Creek Estates Cmty. Ass'n*, No. 12-cv-5911, 2013 U.S. Dist. LEXIS 150016, at *25-31 (E.D. Pa. Oct. 17, 2013) (determining that a coworker's statement that the plaintiff had to be a hooker, without more, was too isolated for a reasonable person to believe it was sexual harassment, and therefore could not be the subject of the retaliation claim).   Other conduct of Dominici that might be considered protected activity was, perhaps, her filing of a Fair Treatment Grievance.   "Filing grievances unrelated to discrimination does not, however, constitute protected activity for purposes of a Title VII retaliation claim."  *Paradisis v. Englewood Hosp. Med. Ctr.*, 680 F. App'x 131, 138 (3d Cir. 2017).  *See also Curay-Cramer v. Ursuline Acad. of Wilmington, Del.*, Inc., 450 F.3d 130, 135 (3d Cir. 2006) ("A general complaint of unfair treatment is insufficient to establish protected activity under Title VII.").   Although Dominici's Fair Treatment Grievance alleged that she experienced disparate treatment and a hostile work environment, there were no allegations that either was due to discrimination based on her membership in any protected class.  *See Barber*, 68 F.3d at 701-02 (holding that the employee's "letter to Human Resources[, which] complains about unfair treatment in general and expresses his dissatisfaction with the fact that someone else was awarded the position, but [] does not specifically complain about age discrimination . . . does not constitute the requisite 'protected  conduct' for a prima facie case of retaliation"). Dominici's written appeal from the Grievance to Blankenhorn similarly fails.  Although Dominici did use the word "discrimination" in the appeal, she did not suggest the basis for any such discrimination or her membership in any protected class.  *See Fisher v. Catholic Soc. Servs.*, No. 18-CV-04653, 2019 U.S. Dist. LEXIS 133322, at *19 (E.D. Pa. Aug. 7, 2019) (explaining that "an employee has engaged in a protected opposition activity when she

complains about unfair treatment *with specific reference to a protected characteristic as the basis for the unfair treatment*" (emphasis added)).  Dominici offers no other evidence of a protected activity.[23]

Moreover, Dominici fails to offer any evidence connecting any (possibly) protected activity and any adverse action.[24]  As to her complaint to Lojeski about Peterson's comment, if true, Dominici offers no evidence as to when this occurred in relation to the written warnings.  Additionally, she does not offer any evidence to suggest Lojeski retaliated against her because she reported the comment; rather, Dominici contends that Lojeski made his decisions (including issuing the written warnings) because of her age, race, or national origin.  *See Hoff*, 2013 U.S. Dist. LEXIS 78782, at *15-16 (dismissing the retaliation claim because the employee failed to plead that the supervisor chose to punish the employee because he complained about a racial comment made by a co-worker).  Similarly, Dominici does not suggest that Rex recommended her termination, which is the only subsequent adverse action, because Dominici complained

---

[23]     Although Dominici asserts that she was retaliated against for requesting vacation time, *see* Pl.'s Dep. 162:1 - 163:9; SJ Resp. 3-4, simply requesting vacation is not a protected activity under Title VII.  *See McCormick v. Allegheny Valley Sch.*, No. 06-3332, 2008 U.S. Dist. LEXIS 8533, at *45-47 (E.D. Pa. Feb. 4, 2008) (holding that merely requesting leave, which involves no protest (formal or informal) of an unlawful practice, cannot constitute a statutorily protected activity for purposes of a Title VII retaliation claim).

[24]     The Court need not even discuss Dominici's schedule, duty, and floor changes, which occurred immediately after Lojeski became her supervisor, because they necessarily occurred prior to Dominici's complaint to Lojeski.  *See Winkelman v. Hose*, No. 14-259ERIE, 2017 U.S. Dist. LEXIS 109336, at *15-16 (W.D. Pa. July 13, 2017) (holding that "the constitutionally protected action of filing a grievance could not have 'caused' a prior scheduling change, and thus cannot support a claim for retaliation").  Furthermore, for the reasons previously explained, these actions, as well as the verbal reprimand for a dress code violation, were not "adverse."  *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300-01 (3d Cir. 1997) (holding that "the 'adverse employment action' element of a retaliation plaintiff's prima facie case incorporates the same requirement that the retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e-2(a)(1) or (2)" and that "not everything that makes an employee unhappy qualifies as retaliation" (internal quotations omitted)).

about Peterson's comment.  Even if she had made this argument, in the absence of any evidence, Dominici's termination three months later is too remote to show a causal connection.  *See Theriault v. Dollar Gen.*, 336 F. App'x 172, 175 (3d Cir. 2009) (determining that the employee "did not establish causation because she was terminated several months after her alleged protected activity").  If the Grievance and/or subsequent appeal were "protected activity," they too, which were even earlier in time, are too temporally remote from her termination.  *See id. See also Monn v. Gettysburg Area Sch. Dist.*, No. 1:12-CV-2085, 2013 U.S. Dist. LEXIS 47371, at *11-12 (M.D. Pa. Apr. 2, 2013) (concluding that "failure to act on a complaint is not a retaliatory or adverse action").

Dominici has therefore failed to make a prima facie case of retaliation.  Moreover, for the reasons previously discussed regarding Dominici's disparate treatment claims, the Hospital has offered legitimate, non-retaliatory reasons for its decisions and there is no evidence of pretext.[25]

## VI.   CONCLUSION

Summary judgment is entered in the Hospital's favor on Dominici's § 1981 claim because her "European" race does not place her in a "racial minority."  Additionally, she fails to point to any evidence to suggest that the Hospital intended to discriminate against her on the basis of race.  The undisputed facts also show that Dominici cannot make a prima facie case of

---

[25]     Further evidencing the absence of pretext is the timing between Dominici's misconduct and the issuance of the written warnings and her termination.  Unlike Dominici's protected activity, which was temporally remote from the adverse actions, Dominici's misconduct occurred within a few weeks or days of the written warnings and of her termination: (1) the First Written Warning was issued approximately a week after Lojeski was notified of one of the cited violations, and all the violations occurred within a two-week time period; (2) Lojeski issued the Final Written Warning less than two weeks after he learned of one of the violations contained therein; and (3) Dominici was terminated the day after she allowed a patient to elope by leaving her ID badge unattended.  The close temporal proximity between Dominici's behavior and the adverse actions tends to negate any suggestion that Lojeski or the Hospital acted for some retaliatory reason, and not because of Dominici's violations.

disparate treatment, hostile work environment, or retaliation because there is no evidence she

was discriminated against on account of race, national origin, or age.  Moreover, even if she had

made a prima facie case, the Hospital has offered legitimate non-discriminatory and non-

retaliatory reasons for its decisions.  Dominici offers no evidence to show that the reasons are

pretextual and essentially admits to the charged conduct.  Consequently, the Motion for

Summary Judgment is granted.  Judgment is entered in favor of the Hospital and against

Dominici on all claims.

A separate Order follows.


BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge